## Case No. 15,475.

### UNITED STATES v. JENNISON.

[1 McCrary, 226.] [1]

Circuit Court, D. Kansas. June, 1874.

FRAUDULENT CLAIMS AGAINST THE UNITED STATES — ACT OF MARCH 2, 1863, CONSTRUED.

The act of March 2, 1863 (12 Stat. 696, §§ 1–3), for the punishment of frauds upon the government by conspiring to obtain the payment or allowance of false claims against it, and by making false affidavits, etc., in support of such claims, construed and applied.

The defendant [Charles R. Jennison] was indicted under the act of congress of March 2, 1863 (12 Stat. 696), for attempting to defraud the United States of the sum of $52,843.64. The indictment in one of the counts charged the defendant with conspiring with one Elias K. Moss for that purpose. The defendant was in command of the Seventh Kansas regiment, in 1861. The affidavit on which the indictment was founded is as follows:

"State of Kansas, County of Leavenworth, ss. I hereby certify that on this 16th day of November, 1871, before me, the subscriber, personally appeared C. R. Jennison, late colonel in the war for the suppression of the Rebellion, and now a citizen of the county of Leavenworth, state of Kansas, who, being duly sworn, makes oath that he is the identical Colonel C. R. Jennison who commanded troops in the Union army during the Rebellion. That while colonel commanding, he was, by order dated October, 1861, and signed by Maj. Gen. Hunter, ordered to move his command to Kansas City, Mo., and there relieve Gen. Sturgis, who was ordered with his command to join Gen. Fremont, Sturgis' command being a part of Fremont's command. Gen. Sturgis was ordered to take all supplies, both quartermaster and commissary, with him to Fremont; that when his (Jennison's) command reached Kansas City, he was compelled to subsist there, both as to quartermaster and commissary stores, upon the country. He ordered his command as a matter of necessity to move on the city of Independence, county of Jackson, state of Missouri, and there to procure supplies; that he did move with his command to the said city of Independence, reaching there the fourteenth day of November; that he collected the citizens into the public square of said city of Independence, and there ordered the quartermaster goods in a hardware store in said city to be taken and carried away for the use of the army; that he has since learned

and now knows that said hardware store belonged to Elias Kendall Moss, at that time of Independence, and that said goods consisted principally of such articles as were used in the quartermaster's department of the U. S. army; and he further states that the goods taken from said Moss at that time by his (Jennison's) command and by his order, were fully of the value stated by said Moss in the account presented by him against the United States, to the best of his knowledge and belief, to wit: $52,843.64. He also states that in that community, as in all others, many articles were taken that were not strictly in accordance with government custom; thereby many innocent parties have suffered without the knowledge of the commanding officer. The quartermaster goods of the stock of hardware taken from the said Moss were used by and for the benefit of the army that could be used, and those things that were deemed unnecessary were sold, and the proceeds turned over to the government, as will appear by the records under his administration. Finally, he states the goods in the foregoing account were taken as a matter of necessity for the benefit of the United States, and were actually used and became the property of the United States. He further states that he has no interest in the prosecution of this claim, either direct or indirect. [Signed] C. R. Jennison. Witness: Julius Haug.

"Sworn to and subscribed before me this 16th day of November, A. D. 1871, and I hereby certify that the affiant is respectable and entitled to credit. [Signed] Julius Haug, Clerk of the District Court in and for Leavenworth County, Kansas."

The indictment alleges that the material statements in this affidavit were false, and known to be so by the defendant when he made them. The evidence produced by the government tended to show that in November, 1861, Jennison's command took possession of—or, in the language of a witness, "jayhawked"—Moss' store at Independence, Missouri, and carried away every article in it, the value of which, however, the prosecution claimed did not exceed $5,000 or $10,000, and that none of the goods were taken for or went to the use of the government. There was some counter evidence on these points. The specific nature of the charges in the indictment and the state of the case made by the testimony appear in the charge of the court.

George R. Peck, Dist. Atty., for the United States.

T. P. Fenlon, J. B. Stewart, and E. Stillings, for defendant.

MILLER, Circuit Justice (charging jury, orally). This trial, through which you have patiently sat for the last twenty-four hours, is no doubt considered by the gov-

[1] [Reported by Hon. Geo. W. McCrary, Circuit Judge, and here reprinted by permission.]

ernment and by the defendant, as one of very considerable importance, and it is important to both parties. I shall endeavor, therefore, to lay down the principles of law that are applicable to the case as clearly as I can, so as to enable you to come to a just conclusion.

The charge, or charges,—for there are four counts in the indictment,—may be divided substantially into two charges, as they are described in the statute upon which the indictment is founded. The first of these which I will mention, though not the first in order, is the charge of conspiracy. The language of the statute on that subject is: "Any person who shall enter into an agreement, combination or conspiracy to cheat and defraud the government of the United States, or any department or officer thereof, by obtaining or assisting to obtain the payment or allowance of any false or fraudulent claim, shall be" [12 Stat. 697] subjected to a certain punishment. That is the language of the act defining conspiracy. And it requires a combination or agreement between two persons, for the purpose of cheating and defrauding the United States in procuring the payment of a false claim. The alleged false claim here is the one set up by Mr. Moss. The charge is that the defendant, Col. Jennison, and Mr. Moss, entered into a combination for the purpose of cheating the United States, by imposing this false claim upon it. In order to convict the defendant on that charge, it is indispensably necessary that you should be convinced by the testimony that there was such a combination or agreement between these two parties. The question whether the defendant aided or intended to aid in imposing a false claim on the government, is another question, and different from conspiracy. He may have intended to aid it without entering into a conspiracy. There must have been a combination, an agreement, an understanding between them that there was a claim to be presented, that it was a false claim, and that they combined, united for the purpose of imposing it on the government, and thus cheating and defrauding it. I think I can take the liberty of saying to you, that, in the absence of any testimony whatever that Jennison ever in his life saw Mr. Moss, and there being no claim that those two men ever met, or even exchanged correspondence in writing, never even knew each other personally, I think I may say to you that you may dismiss the charge of conspiracy from your consideration. There is not sufficient evidence to sustain the charge of conspiracy

Then there remains the other charge,—the one made here,—which is described in the following language in the statute: "Any person who shall, for the purpose of obtaining or aiding in obtaining the approval or payment of any such (false) claim, make, use or cause

to be made or used, any false bill, receipt, voucher, entry, roll, account, claim, statement, certificate, affidavit or deposition"—which is the offense charged here—"knowing the same to contain any false or fraudulent statement or entry, or who shall make or procure to be made, or knowingly advise the making of any false oath to any fact, statement or certificate, voucher or entry, for the purpose of obtaining or of aiding to obtain any approval or payment of any claim against the United States, or any department or officer thereof" [12 Stat. 696], shall be punished, etc. This is the language of the statute, and is what has to be established to your satisfaction as having been done by Col. Jennison, in order to convict him. The charge here, divesting it of all other matters, is that the defendant made a false affidavit in support and in aid of a false claim of Mr. Moss against the government of the United States. Now, I instruct you that it is necessary that the claim itself should be a false claim; in the next place, that the defendant should have made an affidavit; and in the next place, in that affidavit he should have stated facts which were not true; and in the next place, he should have known that they were not true; and he should have stated them with the intent of aiding Mr. M. in cheating and defrauding the government. These elements are necessary for a conviction.

I perhaps might stop here, as that is the law, and about all the law of this case, but I think it proper myself to take some notice of what has been shown in the case. You have all seen the claim, which is satisfactorily shown to have been presented by Mr. Moss against the United States, and the affidavit of the defendant has been read, and his statements been commented upon, and are familiar to you.

The main reliance of the government to convict the defendant is upon the supposed false statement as to the amount or value of the loss sustained by Mr. Moss in consequence of what might be called the raid of the 14th of November, 1861; and second, in the falsehood of the allegation made, that the goods were taken for the uses and purposes of the army of the United States, and if they were not used, a large part or the whole of them were sold, and, to use a modern phrase, the money covered into the treasury. That is the substance of what Jennison swears to in that matter. As regards the value of these goods, the testimony is very inconclusive in every respect. There is no pretense of testifying to the value of the whole or any part of the goods. There is no pretense of producing any exhibits or invoices or written statements of the actual value of the goods at any time, either just before or just after, or any number of years before or after they were taken. The United States has relied wholly on the evidence of one or two men who claim to have been familiar with the goods in the store and with the size of the store. That is the class

of evidence which I have permitted to go to you, and which I remarked at the time, was to be considered for what it was worth. It is very sure that no man going to a store and looking at the goods in it, unless he makes some very accurate calculations or close examinations, can give a certain judgment as to the value of the goods. Nevertheless, inasmuch as that is the best the government has been able to produce, it goes to you for what it is worth. The discrepancy between the witnesses and the amount sworn to by Col. Jennison is very large. It is for you to consider how much nearer correct they are than Jennison, and also what opportunities Jennison had to know. It is further proper to say that one of the witnesses for the government stated, on looking at Moss' bill, that the prices put down there were not exorbitant prices. The prices claimed by Moss, their own witness stated to·be fair prices. So I think you can hardly charge to Jennison an error or mistake as to the amount or value of the goods, as far as concerns the prices, if the schedule shown is correct. But if he is mistaken at all—if he made a false statement at all—to use the language of the indictment, it is probable its falsity consisted in the quantity of the goods. I leave it for you to say whether the defendant intended to commit a crime, the punishment for which might be a term of years in the penitentiary. It is for you to consider all the circumstances under which he might have made an honest mistake. It does not appear that he was ever inside of the store. We have had the testimony of witnesses who were there. Col. Anthony was there, and other witnesses were there, but no man says that Jennison was in the store at that time, or at any other time; therefore he is not chargeable with a knowledge of the quantity of the goods from a personal inspection of them. You should consider that the witnesses testify ten years after the transaction occurred, and that it occurred under circumstances likely to confuse a man, if he were looking at the goods, and it is for you to say whether Jennison made a false statement in regard to the value of those goods.

The other branch of the case is the one I apprehend you will have difficulty over, if you have any difficulty at all, and that is, he is charged, and the affidavit does say, that he took those goods for the use and benefit of his own regiment; though he says in the affidavit that many of them were misapplied and appropriated without his knowledge to wrongful purposes. He says what were not used by the troops were sold by him and the proceeds turned over to some quartermaster. In regard to that he has offered no proof whatever. The other side has offered some circumstantial testimony to show that that is probably not true. They have attempted to show, with what success I leave for you to say, that the troops were not in need of goods of the kind in that store. They have attempted to show that those goods could not have

been carried away. They have attempted to show that he could not have sold those articles, and the proceeds put in the treasury, because Col. Anthony states if any such thing had occurred he must have known it. On the other hand, it is to be observed that while the witnesses say only one wagon—and one says only an ambulance—was there, the testimony shows that five or six came away. What amount of those goods could have been moved in the wagons? Were any of the goods applied to the service and use of the regiment? And did he, as he claims, sell any of them after, though irregularly, without taking a voucher, and deposit the money in some place that he thought was the proper place? That. is for you to say. It is your duty. to determine whether he made a false statement under oath, knowing it to be untrue, and whether he made it with a willful purpose of cheating the government. If he has made a statement and sworn to it, not corruptly, but without much thought or investigation, and having some circumstances on which to base it, you will not be hard with him. But if you believe he had a corrupt purpose,—had an intention to aid in defrauding the government,—if he swore to what was false and knew it to be false, you will find him guilty.

The jury, after being out a few minutes, returned a verdict of "Not guilty."